UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:10-cv-00228-FDW-DSC

| | | |
|---|---|---|
| BRIDGETREE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RED F MARKETING LLC, TARGET | ) | |
| POINT, LLC, DANIEL ROSELLI, TENG | ) | |
| LI, and MARK EPPERLY, | ) | ORDER |
| | ) | |
| Defendants/Counterclaimants, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| BRIDGETREE, INC., and MARK BECK, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |
| | ) | |
| _____ | ) | |

THIS MATTER is before the Court upon the filing of several post-trial motions. Plaintiff has filed a Motion for Attorney Fees (Doc. No. 209), a Motion to Alter Judgment (Doc. No. 218), and a Motion for Permanent Injunction (Doc. No. 223). Defendants have filed a Motion to Stay the Clerk's Judgment (Doc. No. 215), as well as a Motion for Judgment as a Matter of Law, or in the alternative, a Motion to Alter the Judgment or for a New Trial (Doc. No. 217). All parties have responded to all of the pending motions, and they are ripe. The Court will address each motion in turn, but not necessarily in the order in which the parties filed the motions.

## I. BACKGROUND

In the interests of judicial economy, the Court declines to provide a thorough recitation of the testimony, other evidence, and arguments presented at the two-week long trial before a jury

in this matter. The trial involved claims and counterclaims among the parties. In sum, the causes of action centered around Defendant Teng Li's resignation from Plaintiff Bridgetree, Inc.. Following his resignation, he joined Defendants Daniel Roselli and Mark Epperly and became employed at Defendant Red F Marketing. The gravamen of the claims and counterclaims concern all of the parties' actions surrounding Mr. Li's departure from Plaintiff and employment with Red F. The jury returned verdicts in favor of and against each party. The jury found Defendants liable for misappropriation of trade secrets, unfair and deceptive trade practices, and conversion. The jury awarded Plaintiff $4,153,293.00 in total damages based on the following individual claim determinations: (1) $653,293.00 in damages for trade secret misappropriation, as well as $25,000.00 in punitive damages for that claim; (2) $1 in nominal damages for unfair and deceptive trade practices; and (3) $3,500,000.00 in damages for conversion. The jury found Plaintiff and Mark Beck liable to Defendant Mr. Li on his counterclaim for defamation and awarded him $7,500.00 in damages. For purposes of brevity, the Court's discussion below on the motion for judgment as a matter of law more fully sets forth the jury's verdicts and damages, as well as a summary of relevant evidence as to those claims. Discussion of other evidence is also provided throughout as needed to explain the Court's decision.

## II. ANALYSIS

The jury returned its verdicts on Friday, August 10, 2012, and the Clerk entered judgment the following Monday, August 13, 2012. The parties timely filed several post-trial motions, one of which required additional briefing, as explained below, on an issue discovered by the Court *sua sponte*. The Court addresses these motions not in the order in which they were filed, but in what the Court deems to be the most logical progression.

### A. Defendants' Motion to Stay the Clerk's Judgment

Defendants filed a Motion to Stay the Clerk's Judgment (Doc. No. 215) pursuant to Rule 62(b) of the Federal Rules of Civil Procedure on September 10, 2012. Pursuant to that rule, the Court may stay the execution of a judgment pending disposition of certain post-trial motions, including a motion for judgment as a matter of law or a motion to amend or alter the judgment, both of which are pending here. Fed. R. Civ. P. 62(b). After Defendants' motion was filed, Plaintiffs filed an involuntary bankruptcy proceeding against all Defendants except Teng Li and Mark Epperly. (See Doc. No. 241). Pursuant to 11 U.S.C. § 2, a petition filed in bankruptcy "operates as a stay, applicable to all entities, of– . . . (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title . . . ." Thus, by virtue of the bankruptcy filings against Defendants Red F Marketing; Target Point, LLC; and Daniel Roselli, enforcement of the judgment is stayed. This Court's order relieving the stay in part did not lift the stay on enforcement of the judgment. (See Doc. No. 241). Defendants' motion to stay enforcement of the judgment against these three Defendants is therefore denied as moot.

Moreover, as to the remaining Defendants Mr. Li and Mr. Epperly, the Court is guided by Rule 62(b) of the Federal Rules of Civil Procedure, which provides that "[o]n appropriate terms for the opposing party's security, the court may stay the execution of a judgment . . ." pending disposition of certain post-trial motions. Because this Order resolves those post-trial motions, the motion to stay as to these Defendants is also denied as moot.

B.     **Defendants' Motion for Judgment as a Matter of Law, alternative Motion to Alter the Judgment, and alternative Motion for a New Trial**

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, Defendants move for judgment as a matter of law on Plaintiff's claims for misappropriation of trade secrets, unfair and deceptive trade practices, and conversion. Defendants also seek judgment as a matter of law on

their claim against Plaintiff Bridgetree and Mark Beck for unfair and deceptive trade practices. In the alternative and pursuant to Rule 59(e) of the Federal Rules of Civil Procedure, Defendants move to alter the judgment by reducing the amount of damages awarded for Plaintiff's claims of conversion and misappropriation of trade secrets.

If the Court does not grant the motion for judgment as a matter of law or the motion to alter or amend the judgment, Defendants move for a new trial pursuant to Fed. R. Civ. P. 59(a) on Plaintiffs' claims for misappropriation of trade secrets, unfair and deceptive trade practices, and conversion, as well as on Defendants' counterclaim for unfair and deceptive trade practices. Defendant Teng Li also requests a new trial on his claim for defamation on the grounds that the judgment amount is inadequate.

The Court first addresses that portion of the motion requesting judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure. A jury verdict will withstand a Rule 50(b) motion unless no substantial evidence supports the jury verdict. Stamathis v. Flying J, Inc., 389 F.3d 429, 436 (4th Cir. 2004). A Rule 50 motion for judgment as a matter of law is reviewed under the same standard as that applied in reviewing a motion for summary judgment such that the Court must view the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in its favor. See Dennis v. Columbia Colleton Med. Ctr., Inc., 290 F.3d 639, 644–45 (4th Cir. 2002). A verdict may not be set aside unless the Court "determines that the only conclusion a reasonable trier of fact could draw from the evidence is in favor of the moving party." Tools USA and Equip. Co. v. Champ Frame Straightening Equip., Inc., 87 F.3d 654, 656–57 (4th Cir. 1996) (quotation omitted).

In reviewing the arguments pursuant to Rule 59 of the Federal Rules of Civil Procedure, the Court may grant a new trial to any party on all or some of the issues if: "(1) the verdict is

against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (quoting Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996)). In reviewing a motion for a new trial, the Court may not "retry factual findings or credibility determinations reached by the jury." Cline, 144 F.3d at 301. Instead, the Court must "assume that testimony in favor of the non-moving party is credible, unless totally incredible on its face, and ignore the substantive weight of any evidence supporting the moving party." Id. (internal quotation marks and citation omitted). The decision to grant or deny a motion for a new trial is a matter within the Court's discretion. Atlas, 99 F.3d at 594.

### 1. Plaintiff's claim for Misappropriation of Trade Secrets

The jury found Defendants liable for misappropriation of trade secrets and awarded Plaintiff $653,292 in compensatory damages and $25,000 in punitive damages. Defendants argue for judgment as a matter of law (or alternatively for a new trial) because Plaintiff failed to identify its trade secrets with sufficient particularity, failed to prove its alleged trade secrets were "not generally known," failed to prove the alleged trade secrets were misappropriated, and should not have been awarded "security improvement" costs as damages for this claim. The Court addresses these arguments in turn.

Here, using a special verdict form, the jury returned a verdict finding "compilation of scraper source code," "compilation of pre-mover source code," "source code compilations," and "proprietary data compilations" to be Plaintiff's trade secrets. In sum, the jury found all "compilations" listed on the verdict form to constitute a trade secret. To the contrary, the jury rejected all other alleged trade secrets listed on the verdict form – none of which were

compilations.  Thus, the issue turns to whether Plaintiff sufficiently identified its "compilations" as trade secrets.

Under North Carolina law, Plaintiff must provide more than general, sweeping, and conclusory statements and shall "'identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating.'"  Washburn v. Yadkin Valley Bank and Trust Co., 660 S.E.2d 577, 585 (N.C. App. 2008) (quoting VisionAIR, Inc. v. James, 606 S.E.2d 359 (N.C. App. 2004)); see also Analog Devices, Inc. v. Michaelski, 579 S.E.2d 449, 453 (N.C. App. 2003) (affirming denial of preliminary injunction and noting that a party asserting a claim of trade secret misappropriation "must identify a trade secret with sufficient particularity so as to enable a defendant to delineate that which he is accused of misappropriating and a court to determine whether a misappropriation has or is threatened to occur.") (citations omitted).

Here, Plaintiff produced in discovery the source code it claimed to be and to include trade secrets.[1]  This is one sufficient avenue to identify the misappropriated trade secrets.  See Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661-63 (4th Cir. 1993) (holding that production of source code is acceptable method of identifying an alleged compilation trade secret; applying Maryland state statute for misappropriation of trade secrets, which this Court finds substantially similar, if not identical, to N.C. Gen. Stat. § 66-154(a)); see also Decision Insights, Inc. v. Sentia Group, Inc., 311 Fed. Appx. 586, 593 (4th Cir. 2009) (unpublished) (reiterating that production of source code is an acceptable method of identifying an alleged compilation trade secret and remanding to district court for determination of whether "entire software compilation might

---

[1] The Court notes that full disclosure of data and information identified as trade secrets in this matter was made pursuant to a protective order that required the trade secrets be designated as "Attorneys' Eyes Only – Source Code" or "Attorneys' Eyes Only."  (Doc. No. 59).  In the protective order, the parties agreed to certain conditions to protect the confidential nature of the data and to prohibit disclosure of the trade secrets to third parties.

qualify as a 'trade secret' under the Virginia statute"); <u>Avtec Sys., Inc. v. Peiffer</u>, 21 F.3d 568, 575 (4th Cir. 1994) (noting that under merits of misappropriation of trade secrets under Virginia law, "There is no difficulty in finding the existence of a trade secret in the source or object codes to computer programs where question of copyright ownership is not in issue . . . .").

Furthermore, at least one court in North Carolina has approved the identification of trade secrets by disclosure of the actual information claimed to be a trade secret. <u>See</u> <u>Static Control Components, Inc. v. Darkprint Imaging, Inc.</u>, 200 F.Supp.2d 541, 544-45 (M.D.N.C. 2002) (denying motion for summary judgment for failure to specifically identify the trade secrets because the plaintiff produced the actual data—customer lists and vendor information—that it claimed to be protected as a trade secret). In <u>Static Control Components</u>, a case from a sister federal district court in this state, the court also found that the plaintiff had sufficiently identified "technical information" it also claimed to be trade secret by specifically identifying those employees with detailed knowledge of the "technical information." <u>Id.</u> In that case, the court noted that after the plaintiff's identification of employees, the defendant had access for months but did not attempt to issue further discovery or depose the employees. <u>Id.</u> at 545.

Here, Plaintiff provided Defendants with copies of all portions of its source code for its various systems claimed to be a trade secret and specifically identified those technologies it considered to be trade secrets misappropriated by Defendants, including scraper, pre-mover, and print-on-demand. The parties agree this data represented an extremely large batch of information involving hundreds of thousands—if not millions—of lines of code. Therefore, as part of discovery, Plaintiff produced an expert opinion report by Robert Young, who also testified at trial, providing specific examples of where source code appeared to have been copied by Defendants. Indeed, Defendants argued adamantly for this Court to limit the presentation of

particular examples of copying of the source code and prevailed.  (See Doc. No. 112, see also text only order 1/26/2012 granting motion).  In seeking to strike the supplemental expert report of Plaintiff's experts, Defendants demonstrated a clear grasp on what had previously been identified as a trade secret with those identifications that Defendants argued came too late.

In addition, Plaintiff made available employees such as Mark Beck and Dipanker Ghosh for deposition.  These employees had knowledge of the source code, the programs' specific methodologies and processes, and other trade secrets alleged to be misappropriated.  Defendants deposed these employees and asked them about knowledge of the information claimed to be trade secrets.  (See Doc. No. 233-1, 12/22/2011 Dep. Of Mark Beck, 231:1-10; Doc. No. 233-2, 1/03/2012 Dep. Of Dipankar Ghos, 87:7-8).  These witnesses also testified at trial providing knowledgeable testimony about the methods and processes within the source code claimed to be trade secrets.  To the extent Defendants did not follow up, investigate, or cross-examine further to obtain more specific identification of the trade secrets is not for lack of Plaintiff's disclosure of the trade secrets.

Next, Defendants argue that Plaintiff failed to make meaningful identification of its "compilation" trade secrets.  In opposition to this argument, Plaintiff cites to several examples in its brief to demonstrate that it characterized its trade secrets as "a compilation" during discovery and at the summary judgment stage.  (See Doc. No. 233, p. 10-11 citing Docs. Nos. 150, 233-1, 233-2).  For example, Mr. Beck testified in his deposition with specificity about the data, methods, and processes covered by its source code.  When asked about whether Plaintiff's source codes were unique, Mr. Beck replied, "Our processes at Bridgetree are highly customized and they are highly customized to specific customers."  (Doc. No. 233-1, p. 2).  He further testified, "[T]he processes are highly confidential and highly customized and they have formulas,

processes, code that we write, unique code, and they are just a compilation of all kinds of information that is not necessarily out there." Mr. Beck continued, "They are trade secrets. They are methods. You know, I mean, it's just a method and a technique of doing stuff and it takes a great amount of architecting and efforts to get these things to work according to – to make them optimal." Id. The compilations described therein and at trial include combined methods and processes to comprise various systems used in Plaintiff's business for its clients. In sum, Plaintiff adequately identified their compilation trade secrets.

Defendants also argue the jury instructions erroneously allowed the jury to find that "compilation" source code could constitute a trade secret. In support of this argument, Defendants submit that "compilations" are not sufficient trade secrets. To the contrary, North Carolina law specifically defines a trade secret as including "a formula, pattern, program, device, *compilation of information*, method, technique, or process . . . ." N.C. Gen. Stat. § 66-152(3) (emphasis added). Notably, by unrestrictedly defining "trade secret" as "including but not limited to," the statute also leaves open the possibility that other trade secrets other than those specifically enumerated in the statute might exist. Nevertheless, compilation is identified with particularity as a trade secret under North Carolina law.

During the jury charge conference, Defendants raised the issue of the difficulty for the jury to assess the difference between the available options on the special verdict form to find "scraper source code" to be a trade secret as well as the option to choose "compilation scraper source code" as a secret. Neither party requested "compilation" be defined in the jury instructions, and the Court did not provide any such definition. During the charge conference, the Court noted that compilation could mean "putting together a collection of existing source codes, scraper source code," (Doc. No. 243-4, Tr. Vol. IX, 8/9/12, p. 2119-20), it is possible that

compilation does not have to mean the entirety of the scraper source code.[2]  The jury could have

decided that "compilations" meant portions of the source code combined to perform certain

functions, which Plaintiff had specifically identified in discovery, at the summary judgment

stage, and at trial.

Recently, a court in the District of South Carolina considered the sufficiency of

identification of compilation trade secrets and summarized what constituted a compilation based

on cases from various jurisdictions.  See Uhlig LLC v. Shirley, 6:08-CV-01208-JMC, 2012 WL

2923242 (D.S.C. July 17, 2012) (unpublished) (collecting cases).  Citing a case from the Middle

District of North Carolina, the Uhlig case stated, "A compilation trade secret is, generally, not an

amorphous collection of information. Instead, the compilation must work together to embody a

definite methodology, process, technique, or strategy."  Id. at *5 (citing Philips Elecs. N. Am.

Corp. v. Hope, 631 F.Supp.2d 705, 721 (M.D.N.C. 2009) (citations omitted) (finding that a select

market data analysis based on special knowledge of specific customer needs and preferences

contained in "[c]ustomer pricing lists, cost information, confidential customer lists, and pricing

and bidding formulas may constitute trade secrets" sufficient to warrant a preliminary injunction)

(other citations omitted).  Here, the evidence showed that Plaintiff's different source codes for its

scraper, pre-mover, and print-on-demand services included various functions, methods, and

processes, each of which—when combined in a certain manner—could reasonably constitute a

"compilation" for the different technologies found to be a trade secret by the jury ("compilation

of scraper source code," "compilation of pre-mover source code," and "compilation of print-on-

demand source code").  Additionally, all three of these source codes could combine to form the

---

[2] During the exchange with the Court on this issue prior to jury instructions, Plaintiff's counsel stated that a
compilation could be the collection of five elements, as well as "the combinations of 1, 3, and 5, 2 and 4, and the
like.  That is really what the genius of Beck's system was.  And he, as Mr. Morrison has indicated, described it at
some length."  (Doc. No. 243-4; Tr. Vol. IX 8/9/2012, p. 2127).

"source code compilations" also found to be a trade secret by the jury. See e.g., Decision Insights, Inc. v. Sentia Group, Inc., 416 F. App'x 324, 329 (4th Cir. 2011) (holding that under the applicable Virginia trade secret statute, "[I]t is clear that a software compilation such as [the plaintiff's] EU Model can qualify for protection as a trade secret . . . ."). Mr. Beck's testimony at trial provided evidence of such a compilation. He testified that portions of Plaintiff's software *and* the entirety of Plaintiff's software when put all together are unique to Plaintiff. (Doc. No. 189, Tr. 7/31/12, p. 433). Accordingly, this argument also fails.

The fact that the jury found "compilation" source code to be a trade secret but did not find the individual source codes to be a trade secret is of no moment. In the Decision Insights case, the court noted that although individual portions of code were insufficiently identified to constitute a trade secret, a triable issue might exist as to whether the entire source code could constitute a trade secret. 311 Fed. Appx. at 594. Similarly, in Trandes, the plaintiff failed to specifically identify the separate formulas and methods of calculation to establish a trade secret, but finding sufficient evidence that software itself—identified by source code and produced at trial—constituted a trade secret. 996 F.2d at 662-63.

Defendants also submit that Plaintiff failed to prove its trade secrets are "not generally known," as required by North Carolina law. Under N.C. Gen. Stat. § 66-152, a trade secret such as a compilation must "derive[] independent actual or potential commercial value from not being generally known . . . ." The statute further provides that the existence of a trade secret "shall not be negated merely because the information comprising the trade secret has also been developed, used, or owned independently by more than one person, or licensed to other persons." Id. Defendants assert that numerous companies engage in the technologies asserted to be protected as trade secrets by Plaintiff's source code. This fact alone is insufficient to determine that

Plaintiff's failed to show its trade secrets are "not generally known." Moreover, even if some of the technologies or components of the source code compilations are publicly available, the combination of the processes and methods could be unique so as to be superior in the marketplace and distinguishable from the competition. Indeed, Mr. Beck testified to this fact. (Doc. No. 189, Tr. 7/31/12, p. 433). Plaintiff submits that to accept Defendants' argument would lead to the conclusion that the secret formula for Coca-Cola does not warrant trade secret protection because numerous other competitors also make cola soft drinks. The Court agrees. The existence of similar products in the marketplace, some of which may include similarities in their formulas and methods, does not foreclose the fact that a unique combination of processes could be "not generally known." Here, Defendants failed to present any evidence that competitors used the same compilations of source code as Plaintiff. Moreover, testimony from Mr. Beck, as well as Mr. Ghosh and Chris Talley (both of whom serve in executive functions with Plaintiff), demonstrated that Plaintiff made substantial and reasonable efforts to maintain the source code compilations as secret and confidential. Evidence also demonstrated the substantial value of the compilation source codes and the fact that Plaintiff's products, which were based on its source code compilations, held commercial value in the marketplace further indicates they were not generally known. This argument fails to support judgment as a matter of law.

Third, Defendants argue that Plaintiff did not provide *any* evidence that Defendants misappropriated any of the compilations that the jury found to be a trade secret. Pursuant to N.C. Gen. Stat. § 66-152, the jury was instructed that "misappropriation" meant "the acquisition, disclosure, or use of a trade secret of another without express or implied authority or consent." Contrary to Defendants' argument, Plaintiff presented testimony and physical evidence

supporting the jury's finding of misappropriation. Testimony showed that Mr. Li acquired trade secrets upon his departure from Plaintiff through the downloading of information from Plaintiff's servers to a one-terabyte flash drive owned by Mr. Li and retained by him following his resignation. Spoliation of evidence—including the deletion of information from Mr. Li's computer he used while employed with Plaintiff, along with the discarding of a personal family computer he used for work while employed by Plaintiff—provides circumstantial evidence to permit the jury to draw an adverse inference of misappropriation through the "acquisition" of compilation source codes, particularly when combined with the evidence that Defendants were quickly able to develop certain computer programs shortly after Mr. Li joined Red F and Target Point.

The Court notes that <u>Phillips</u> also supports the jury's verdict finding misappropriation. In <u>Phillips</u>, the court noted, "Courts have found misappropriation where a former employee had access to confidential information or helped a competitor quickly deliver new products to market." 631 F. Supp. 2d at 722 (M.D.N.C. 2009) (citing <u>Static Control Components, Inc.</u>, 200 F.Supp.2d at 545–46). The evidence at trial in this case mirrored such an instance. Prior to the hiring of Mr. Li, Defendants Mr. Roselli, Mr. Epperly, Red F and Target Point desired but did not have working technologies, which Defendants quickly developed within a short time of Mr. Li leaving his employ with Plaintiff and commencing employment with Red F. The jury could reasonably infer that the evidence showing Red F subsequently had working technologies to compete with Plaintiff following the hiring of Mr. Li indicated Defendants misappropriated trade secrets including the entire source code. Plaintiff also presented sufficient testimony from various witnesses, including its expert Mr. Young, who provided the jury with specific examples comparing Plaintiff's source code with Defendants' source code to demonstrate misappropriation

of trade secrets. It is well-settled under North Carolina law, "Direct evidence [. . .] is not necessary to establish a claim for misappropriation of trade secrets; rather, such a claim may be proven through circumstantial evidence." <u>Med. Staffing Network, Inc. v. Ridgway</u>, 670 S.E.2d 321, 329 (N.C. App. 2009) (citations omitted) (collecting cases where courts have held circumstantial evidence to be sufficient to support a misappropriation of trade secrets cause of action). Here, the circumstantial evidence—especially when considered collectively—overwhelmingly supports the jury's verdict finding misappropriation of trade secrets.

In their final argument concerning misappropriation of trade secrets, Defendants submit that the jury improperly awarded Plaintiff "security improvement" costs as damages for this claim. The jury awarded Plaintiff $653,292.00 in trade secret damages, which matches the exact amount Plaintiff's witnesses testified that it spent on security improvements after Defendants misappropriated trade secrets. Remarkably, the gravamen of Defendants' argument on this point centers around the weight of the evidence, and they specifically focus on the lack of causation evidence. Defendants fail to cite any case law that indicates the evidence on security improvements was improper as a measure of damages as a matter of law.

The Court instructed the jury as to the permissible considerations in awarding damages to Plaintiff on this claim:

> Bridgetree may also be entitled to recover actual damages. On this issue the burden of proof is on Bridgetree. This means that Bridgetree must prove, by the greater weight of the evidence, the amount of actual damages sustained, if any, as a result of the misappropriation of the Bridgetree's trade secret.
>
> For its actual damages, Bridgetree may recover its economic loss or the amount by which Defendants were unjustly enriched by the misappropriation, whichever is greater.
>
> Bridgetree's actual damages are to be reasonably determined from the evidence presented in the case. Bridgetree is not required to prove with mathematical certainty the extent of its economic loss or Defendants' unjust enrichment in order to recover actual damages. Thus, Bridgetree should not be denied actual damages

simply because they cannot be calculated with exactness or a high degree of mathematical certainty. An award of actual damages must be based on evidence which shows the amount of Bridgetree's actual damages with reasonable certainty. However, you may not award any actual damages based upon mere speculation or conjecture.

(Doc. No. 243-5, Tr. 8/10/12, p. 48). This instruction tracks the pattern jury instructions in North Carolina, see N.C.P.I. – Civil 813.98, and mirrors the language from N.C. Gen. Stat. § 66-154(b). "Jurors are presumed to follow the court's instructions." Francis v. Ingles, 1 F. App'x 152, 157 (4th Cir. 2001) (citing Weeks v. Angelone, 528 U.S. 225, 234 (2000)).

Here, Plaintiff presented substantial evidence to support the jury's award of damages, including evidence of its economic loss, including money spent developing the trade secrets and money spent as a direct result of Mr. Li's resignation and acquisition of trade secrets prior to his departure from Plaintiff. Plaintiff's witnesses testified at trial that, while employed by Plaintiff, Mr. Li's job duties included being head of security. Other evidence indicated that Mr. Li took information that would allow him access to confidential information and trade secrets even after his employment with Plaintiff ended. Consequently, Plaintiff made the security modifications and improvements following Mr. Li's departure. A reasonable juror could find such evidence to show the security improvements were a necessary expense and proximately caused by Defendants' misappropriation. Defendants' argument on this point fails.

### 2. Plaintiff's Claim for Unfair and Deceptive Trade Practices

The jury found Defendants were liable to Plaintiff for unfair and deceptive trade practices and awarded Plaintiff one dollar in nominal damages. Defendants argue that the jury should not have been permitted to consider whether Defendants had "copied or used Bridgetree's confidential information unfairly or deceptively." As an initial matter, the verdict form and accompanying jury instructions permitted the jury to consider two different grounds in order to find unfair and deceptive conduct. (Doc. No. 197). The jury could find Defendants (1)

misappropriated one or more of Plaintiff's trade secrets, and/or (2) copied or used Plaintiff's confidential information unfairly or deceptively. (Id., see also Doc. No. 243-5, Tr. 8/10/12, pp. 52-54). The jury found Defendants engaged in *both* instances of conduct and further found such conduct to be in or affecting commerce and a proximate cause of Plaintiff's injury. As discussed above, the Court has already upheld the jury's verdict on misappropriation of trade secrets because competent evidence supports such a finding. This determination—along with the jury's finding of "in or affecting commerce" and "proximate causation"—satisfies the requirements to sustain the jury's verdict holding Defendants liable for unfair and deceptive trade practices. Med. Staffing Network, Inc. v. Ridgway, 670 S.E.2d 321, 329 (N.C. App. 2009) ("A violation of the Trade Secrets Protection Act constitutes an unfair act or practice under N.C. Gen. Stat. § 75-1.1; N.C. Gen. Stat. § 66-146."). Thus, even if the Court agreed with Defendants' argument that the jury should not have considered whether Defendants copied or used Plaintiff's confidential information unfairly and deceptively, the jury's verdict finding liability for unfair and deceptive trade practices could still stand based on the jury's verdict on misappropriation of trade secrets.

Nevertheless, the Court provides the following brief discussion on the alternative basis for the jury's finding of unfair and deceptive conduct—whether Defendants copied or used Plaintiff's confidential information unfairly or deceptively. Defendants contend North Carolina does not permit an unfair and deceptive trade practice claim based on copying or use of "confidential information." In support of their argument, Defendants point to a recent unpublished case from the North Carolina Court of Appeals where the court stated in a footnote that it was unaware of any case in North Carolina dealing with misappropriation of proprietary confidential information as a separate cause of action. Edgewater Services, Inc. v. Epic Logistics, Inc., 720 S.E.2d 30, n. 2 (N.C. Ct. App. 2011). Remarkably, in upholding the jury's

verdict finding the defendant liable for "misappropriation of proprietary confidential information," the Edgewater court noted that it explicitly declined to decide whether such a cause of action exists because the appellant had not argued the issue of whether misappropriation of proprietary confidential information is a valid cause of action.  Id.

Defendants' reliance on this case is misplaced.  In the case at bar, Plaintiff did not assert a claim for "misappropriation of proprietary confidential information" as a separate cause of action apart from its other claims.  Instead, the jury could only find Defendants liable for misappropriation of "proprietary data compilations" if the jury *first* found such information to be a trade secret in Count One.  (Doc. No. 197, Question 1(a)(viii)).  Edgewater did not consider "misappropriation of proprietary confidential information" in the context of fulfilling part of the elements for a trade secrets claim.  Likewise, Edgewater did not consider whether an unfair and deceptive trade practices claim could be premised upon the misappropriation or taking of proprietary, confidential information.  At best, the court merely mentioned—in dicta—that it was unaware of any caselaw setting forth the elements for misappropriation of confidential information as a stand-alone claim.  Consequently, this case is of little significance to this Court.

Second, during the jury charge conference, this Court spent considerable time and effort seeking an agreeable definition for "confidential information" that stated the appropriate considerations for the jury in accordance with North Carolina law.  The Court instructed the jury as to the following:

> In order for you to find that there is confidential information, you must find that Defendant Teng Li knew of and had to follow Bridgetree's confidentiality requirements that existed in 2010, if any.  In determining whether any of Bridgetree's information is confidential, you may consider:
>
> (a)     The extent to which the information is generally known outside Bridgetree's business;

(b)     The extent to which the information is generally known by Bridgetree's employees and others involved in its business;

(c)     The extent of measures taken by Bridgetree to guard the secrecy of the information.

(Doc. No. 243-5, Tr. 8/10/12, pp. 52-53).   Defendants have failed to demonstrate that this instruction is contrary to North Carolina law.

Defendants also argue that in order for a jury to consider use and copying of confidential information in the context of unfair and deceptive trade practices, a plaintiff must first demonstrate an employment contract containing a covenant to not disclose confidential information.   Although a review of the cases cited by Defendants mention the existence of an employment contract containing confidentiality clauses, the cases stop short of *requiring* a contract or acquiescence of an employee to a confidentiality policy.   Nevertheless, to the extent an employer must specify such a policy or prohibition on disclosure of confidential information, the jury instructions given in this case required the jury to find that Defendant Mr. Li knew of and was bound by Plaintiff's confidentiality requirements that existed in 2010.

Finally, the Court notes that North Carolina's Unfair and Deceptive Trade Practices Act ("UDTPA") is a broad statute with expansive language encompassing various types of unfair trade or business practices.   N.C. Gen. Stat. § 75-1.1, et. seq., see also Drouillard v. Keister Williams Newspaper Services, Inc., 423 S.E.2d 324, 326 (N.C. App. 1992) (rejecting notion that in order to qualify under the UDTPA, the conduct must be specifically prohibited by statute; "N.C. Gen. Stat. § 75–1.1 should not be so narrowly construed. This section declares '[u]nfair methods of competition in or affecting commerce,' to be unlawful. The statute was created to provide an additional remedy apart from those less adequate remedies afforded under common law causes of action for fraud, breach of contract, or breach of warranty. The result was a broader cause of action with broader remedies.").   There is no limited, enumerated list of

offensive conduct that satisfies the statutory requirement, and instead, determination of whether a practice is unfair or deceptive requires consideration of the facts on a case-by-case basis. "A practice is unfair if it is unethical or unscrupulous, and it is deceptive if it has a tendency to deceive." Sunbelt Rentals, Inc. v. Head & Engquist Equip., L.L.C., 620 S.E.2d 222, 230 (N.C. App. 2005) (citing Polo Fashions, Inc. v. Craftex, Inc., 816 F.2d 145 (4th Cir. 1987) (citing Marshall v. Miller, 276 S.E.2d 397, 403 (N.C. 1981))). Moreover, the UDTPA "is directed toward maintaining ethical standards in dealings between persons engaged in business and to promote good faith at all levels of commerce." McDonald v. Scarboro, 370 S.E.2d 680, 685 (N.C. App. 1988) (citation omitted). Without any express authority from North Carolina courts to the contrary, this Court finds that the evidence presented at trial indicating that Defendants discussed and implemented a business and employment plan to copy and use Plaintiff's confidential information satisfies the requisite element to show they committed an unfair or deceptive act or practice under North Carolina law. Under these facts, competent evidence shows that Defendants copied and used Plaintiff's confidential information to further Defendants' own business interests in an unfair and deceptive manner. Defendants argument as to this claim fails.

### 3. Plaintiff's Claim for Conversion

The jury found Defendants Li and Red F liable for conversion of "computer files" and awarded Plaintiff $3.5 million in damages. Defendants have repeatedly argued to this Court that Plaintiff cannot prove as a matter of law that these Defendants wrongfully deprived Plaintiff of its "dominion over or rights in the property." Lake Mary L.P. v. Johnston, 551 S.E.2d 546, 552 (N.C. App. 2001). Defendants contend that by *copying* computer files, neither Mr. Li nor Red F deprived Plaintiff—as the owner—of any access, rights or use of the proprietary data.

### a. Preemption

In analyzing whether Defendants are entitled to judgment as a matter of law or a new trial on Plaintiff's conversion claim, the Court *sua sponte* identified a threshold consideration, which Defendants never asserted, argued or raised, of whether this state-law claim is preempted by federal copyright law.[3]  In order to hear both sides' positions on this unmentioned issue, the Court requested the parties submit supplemental briefing.  (Doc. No. 245).

As an initial matter, the Court considers whether Defendants waived this defense by failing to allege or argue it at any stage of the proceedings until prompted by the Court.

> While complete preemption is clearly a jurisdictional issue which must be addressed by the court regardless of whether it is raised, New Orleans & Gulf Coast Ry. Co. v. Barrois, 533 F.3d 321, 331 (5th Cir.2008), ordinary preemption appears to be an affirmative defense, but it is less than clear whether it is waived if not pleaded. International Longshoremen's Ass'n v. Davis, 476 U.S. 380, 392–93, 106 S.Ct. 1904, 90 L.Ed.2d 389 (1986).

First Union Rail Corp. v. Springfield Terminal Ry. Co., 3:08CV230, 2009 WL 1469632 (W.D.N.C. May 20, 2009).  This Court is unaware of any case from the Fourth Circuit squarely

---

[3] The Court's review of case law relevant to the pending post-trial motions identified the possibility that a state law claim for conversion of objects that fall within the subject matter of copyright—even if not registered under a copyright—might be preempted by the Copyright Act, 17 U.S.C. § 101, *et. seq.*  The Fourth Circuit has explained:
> "We use a two-part test to determine if a claim is preempted by the Copyright Act, looking at (1) whether the claim "falls within the subject matter of copyright" and (2) whether the claim "protects rights that are equivalent to any of the exclusive rights of a federal copyright." Carson v. Dynegy, Inc., 344 F.3d 446, 456 (5th Cir.2003) (internal quotation marks omitted). "[B]oth prongs of [this] two-factor test must be satisfied for preemption to occur." Id.

Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd., 682 F.3d 292, 309 (4th Cir. 2012) cert. denied, 12-444, 2013 WL 57138 (U.S. Jan. 7, 2013); see also U.S. ex rel. Berge v. Bd. of Trustees of the Univ. of Alabama, 104 F.3d 1453, 1463 (4th Cir. 1997).  "It is hornbook law that a state law action for conversion will not be preempted if the plaintiff can prove the extra element that the defendant unlawfully retained the physical object embodying plaintiff's work. . . . However, [17 U.S.C.] § 301(a) will preempt a conversion claim where the plaintiff alleges only the unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work." U.S. ex rel. Berge, 104 F.3d at 1463 (citations and quotations omitted).  The Fourth Circuit has recognized that, by statute, "computer *programs*" are within the subject matter of copyright because they are "'original works of authorship fixed in [a] tangible medium of expression . . . from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device.'" Rosciszewski v. Arete Associates, Inc., 1 F.3d 225, 229 (4th Cir. 1993) (emphasis added) (quoting 17 U.S.C.A. § 102(a) (West Supp.1993)); see also Trandes Corp., 996 F.2d at 659 (collecting cases).  That said, Plaintiff alleged and the evidence at trial tended to show that Defendants converted more than just computer *programs*.  Nevertheless, because the Court had not heard even the slightest mention of the application of the Copyright Act to Plaintiff's conversion claim, the Court requested supplemental briefing from the parties.

addressing the waiver of preemption issue in copyright cases; however, other circuit cases addressing this issue prove instructive. Both the First Circuit and Eight Circuit have ruled that a party may waive the argument that the Copyright Act preempts a state law claim. Curet-Velazquez v. ACEMLA de Puerto Rico, Inc., 656 F.3d 47, 52-53 (1st Cir. 2011) ("We do not find any evidence in the record below that [the defendants] argued that the Copyright Act preempts the cause of action for rescission of contract under Puerto Rico law.") (citations omitted), cert. denied, 132 S. Ct. 1863, 182 L. Ed. 2d 644 (U.S. 2012); Ventura v. Titan Sports, Inc., 65 F.3d 725, 730 n. 6 (8th Cir. 1995) (denying the defendant's request for supplemental briefing on Copyright Act preemption, while noting that it might preempt some of the plaintiff's claims, because "[the defendant] has not timely raised the issue of preemption on appeal, and has therefore waived it") (citations omitted).

Similarly, several district courts have also held that Copyright Act preemption must be affirmatively raised. DIRECTV, Inc. v. Barrett, 311 F. Supp. 2d 1143, 1146-47 (D. Kan. 2004) (concluding the defendant waived her preemption defense under the Federal Copyright Act, 17 U.S.C. § 301, against the plaintiff's conversion claim; declining to consider the merits of her preemption argument; and denying motion to dismiss on that basis); see also Integrated Bar Coding Sys., Co. v. Wemert, 04-60271, 2007 WL 496464 *9 (E.D. Mich. Feb. 12, 2007) (holding that failure to plead preemption in the answer constitutes waiver of it as a defense; "Defendants have not cited, nor has the Court found, any case law holding that federal copyright law preemption is jurisdictional, and therefore, is a defense that cannot be waived. As a result, Defendants' [sic] have waived the ability to raise preemption as a defense to Plaintiff's state law claims."); Thomas & Thomas Architects, Ltd. v. Cyrus Homes, Inc., 97 C 6936, 1998 WL 321463 *4 (N.D. Ill. June 12, 1998) ("Having failed to raise [Copyright Act] preemption as an

affirmative defense in their answers, defendants cannot assert a preemption defense for the first time in reply memoranda supporting their motions for summary judgment.") (citing Wolf v. Reliance Standard Life Insurance Co., 71 F.3d 444, 449 (1st Cir. 1995)).

Here, Defendants unequivocally failed to plead as a defense or otherwise assert or argue prior to or during trial that the Copyright Act bars Plaintiff's conversion claim.[4]  In one post-trial filing, Defendants, in a footnote referenced in the discussion of Plaintiff's unfair and deceptive trade practices claim, obviously recognized but did not expound upon the possibility that copyright law might preempt the UDTPA claim.  Defendants stated, "liability based merely on copying information *could* very well be preempted by copyright law . . . ." (Doc. No. 217-1, p. 16) (emphasis added) (citing Trandes Corp., 996 F.2d 655).  This broadly-worded footnote fails to fully argue application of the preemption defense to the UDTPA claim, and instead merely acknowledges that preemption may *potentially* apply.  Even presuming this vague sentence (and citation to a case that determined copyright law did *not* preempt a state law claim for misappropriation of trade secrets) could be read to provide sufficient notice to Plaintiff of Defendant's post-trial assertion of preemption of the UDTPA claim, Defendants provide *no* such discussion, re-citation, or reincorporation of the argument in that portion of their brief seeking judgment as a matter of law or a new trial on conversion.  In fact, Defendants *never* fully developed this argument or explained the relevance of preemption to the case at bar in any of their numerous post-trial submissions; that is, until specifically requested by the Court. Defendants' failure to timely and adequately assert copyright law preemption against the conversion claim constitutes a waiver of this defense.

---

[4] The Court notes that the supplemental briefing, provided at the *Court's request*, is insufficient to overcome such waiver.  The Court simply requested the parties to provide their respective positions for the record, including the "effect [of the doctrine of preemption] at this stage in the proceedings." (Doc. No. 245, pp. 1-2).  In so stating, the Court cautiously avoided prompting an argument on waiver, but anticipated and was fully aware of the possibility that Defendants had foreclosed the opportunity to assert such a defense so late in the game.

Defendants argue that even if they waived the defense, the Court should nonetheless, in its discretion, address the merits to fully dispose of Plaintiff's conversion claim. (Doc. No. 250, p. 10). Defendants submit that Plaintiff would not be prejudiced since Plaintiff now has had a full opportunity to respond to Defendants' preemption argument. To the contrary, even if the Court overlooked Defendants' failure to timely assert this defense *and* even if the Court resolved the issue in Defendants' favor, such a ruling at this juncture prevents Plaintiff from any opportunity to restructure its arguments to the jury. Sweeney v. Westvaco Co., 926 F.2d 29, 41 (1st Cir. 1991) (noting the defendant "could have raised pre-emption at any point before the jury deliberated. There is no good reason for its neglect. The unfairness is obvious and aggravated here, by the fact that, at least arguably, [the plaintiff] might have tried to reshape her case . . . ."). To now allow Defendants to assert a preemption defense—which was never pursued in advance of, during, or even after trial until the Court's request, well after the close of post-trial briefing— would be procedurally improper and could result in unfair surprise and prejudice if the merits were resolved in Defendants' favor. "[A] litigant cannot strategically lie behind the log until after the trial and receipt of evidence, argument, and charge to the jury before raising an issue not found in the pleadings nor included in the pre-trial order and then raise it when it is too late for his opponent to do anything about it. The manifest prejudice of such tactics would make a shambles of the efficacy of pre-trial orders and a fair trial." Bettes v. Stonewall Ins. Co., 480 F.2d 92, 94 (5th Cir. 1973). Therefore, the Court, in its discretion and because of the prejudice to Plaintiff, declines to address the merits of whether the Copyright Act preempts Plaintiff's claim for conversion.[5]

---

[5] The Court notes that Defendants concede that the Copyright Act does not preempt a proper claim for conversion under North Carolina law. (Doc. No. 250, p. 6). Defendants argue, however, that the claim Plaintiff presented to the jury "was not a true claim for conversion," but was instead a claim for "trespass to chattels," which Defendants

### b. Merits of Defendants' Motion

Here, Plaintiff's Complaint alleged that Mr. Li "wrongfully converted Bridgetree property, including files taken from computers belonging to Bridgetree, for his and Red F's own use and enjoyment . . . ." (Doc. No. 1, p. 41). At trial, the Court instructed the jury that in order to find Mr. Li and Red F liable for conversion, the jury must find these Defendants engaged in (1) the unauthorized exercise of a right of ownership over property belonging to another, or (2) the unauthorized exclusion of an owner from exercising his rights of ownership or control over its property. Doc. No. 243-5, Tr. 8/10/12, p. 65; <u>see also</u> N.C.P.I. – Civil 806.00. Competent evidence supports a finding in favor of Plaintiff on both of these avenues of proof.

Evidence showed that neither Mr. Li nor Red F was authorized to own the computer files taken from and belonging to Plaintiff. Additionally, as explained below, the taking of Plaintiff's computer files excluded Plaintiff from exercising its sole right of ownership *and control* over the computer files. Recently, a colleague of this Court explained that the unauthorized copying (and taking of that copy) of proprietary information can constitute a claim for conversion under North Carolina law. In <u>Springs v. Mayer Brown, LLP</u>, 3:09CV352, 2012 WL 366283 *9 (W.D.N.C. Jan. 27, 2012), the Honorable Max O. Cogburn summarized state law on this claim:

> In North Carolina, a common-law claim for conversion is defined as "an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of an owner's rights." <u>Spinks v. Taylor</u>, 303 N.C. 256, 264, 278 S.E.2d 501 (1981) (citation and corresponding quotation marks omitted). It is of no "importance what subsequent application was made of the converted property, or that the defendant derived no benefit from the act," so long as there has been a denial or violation of the plaintiff's dominion over or rights in the property. <u>Lake Mary Ltd. Partnership v. Johnston</u>, 145 N.C.App. 525, 531, 551 S.E.2d 546 (2001).

---

submit *is* preempted by the Copyright Act. (<u>Id.</u> at pp. 8-9). For the reasons explained above, Defendants have waived the assertion of the preemption defense.

In Springs, the plaintiff sought to recover from the defendant for wrongful termination. The defendant asserted counterclaims, including a cause of action for conversion based on evidence that the plaintiff had made hard and electronic copies of digitally-stored proprietary information and confidential documents after being notified of her impending termination. In denying summary judgment for the plaintiff on the defendant's conversion claim, the court explicitly rejected the theory that the plaintiff's taking of a "copy" precluded her from being liable for conversion. The court explained:

> That plaintiff did not destroy the data base or exclude [the defendant] from its digitally stored material is of no moment, as what constitutes "unauthorized" possession or interference with another's ownership of goods or chattels depends upon the circumstances under which such interference arose. Madey v. Duke Univ., 336 F.Supp.2d 583 (M.D.N.C. 2004); Binkley v. Loughran, 714 F.Supp. 776 (M.D.N.C.1989), aff'd, 940 F.2d 651 (4th Cir. 1991). Clearly, defendant has presented a forecast of evidence that plaintiff has taken away from the firm things of value that she was not authorized to take, and as to such copies, plaintiff has excluded defendant from exercising the control over its proprietary and/or confidential documents.

Springs, 2012 WL 366283 *9. Similar to the forecast of evidence in Springs, competent and substantial evidence showed that around the time of his resignation from Plaintiff, Mr. Li downloaded electronic copies of Plaintiff's digitally-stored proprietary information and confidential documents. Mr. Li and Red F retained copies of these computer files in a manner such that Plaintiff had no control or dominion over this property.

This Court finds the reasoning in Springs persuasive and concludes that Plaintiff's evidence is sufficient to support a conversion claim because it excluded Plaintiff from exercising control over its proprietary information. The Court adds that to conclude otherwise would mean that computer files and other electronically-stored information—which the Court believes is generally accepted as the preferred storage method for large amounts of data and proprietary information in this modern age—could never be converted simply because it would be difficult,

if not impossible, to take the original electronic file leaving no copy in the hands of the true owner, particularly in this day of back-up and archival technology systems. But, a copy of such information in the hands of a competitor or other person deprives the owner of its sole ownership rights, which is exactly what makes the information "proprietary" in the first place. The Court is unaware of any North Carolina case that holds that taking a copy of an electronic file cannot constitute conversion. Defendants' citations to federal district court cases from Georgia and the District of Columbia are unavailing.

Moreover, North Carolina law allows a claim for conversion to be premised on something other than *just* the denial of the rights to the property. "[T]he general rule is that there is no conversion until some act is done which is a denial *or violation of the plaintiff's dominion over or rights in the property*." Lake Mary Ltd. P'ship, 551 S.E.2d at 552. Thus, Defendants' conduct did not need to completely deprive Plaintiff use and access to its computer files. It would be sufficient if Defendants' conduct violated Plaintiff's dominion or control over the property (here, the computer files), id., or if Defendants altered the condition of Plaintiff's rights to those computer files. See Spinks v. Taylor, 278 S.E.2d 501, 506 (N.C. 1981) (citing Peed v. Burleson, Inc., 94 S.E.2d 351, 353 (N.C. 1956)).

By taking a copy of the computer files, a tangible property albeit in electronic form,[6] Mr. Li and Red F deprived Plaintiff of the sole and exclusive dominion and control over the proprietary information. The computer files copied and taken by Defendants held value not only because of their cost to develop but also because of their role in the operation of Plaintiff's business. Without the exclusive right to dominion over that proprietary information, Defendants

---

[6] See Combined Ins. Co. of America v. Wiest, 578 F.Supp.2d 822, 835 (W.D.Va. 2008) (denying motion to dismiss conversion claim under Virginia law where conversion was based on the taking of electronic versions of confidential, proprietary information; noting that the "conversion claim does not fail merely because the property at issue is 'an electronic version of the list rather than a hard copy").

wrongfully deprived Plaintiff of true ownership over the property. Competent and substantial evidence of Defendants' taking of computer files, which included proprietary information more than just the source code compilations found to be trade secrets, supports the jury's verdict finding liability for conversion.

Defendants also argue that the jury's award of damages for conversion was "wrong as a matter of law and logic." This Court disagrees. "'The assessment of damages is entrusted to the jury, and is not subject to review unless unconscionable or motivated by extreme prejudice.'" First Union Commercial Corp. v. GATX Capital Corp., 411 F.3d 551, 556 (4th Cir. 2005) (quoting Compton v. Wyle Labs., 674 F.2d 206, 209 (4th Cir.1982); see also Barber v. Whirlpool Corp., 34 F.3d 1268, 1279 (4th Cir.1994)). Here, Plaintiff presented substantial evidence to support the jury's award, including evidence and testimony tending to show the value of Plaintiff's business, as well as the cost to establish and develop some of the proprietary information taken by Defendants. Defendants argue that since Plaintiff retained possession of and the right to use its confidential information, Plaintiff should not be allowed "full value" for its proprietary information. To the contrary, *no* evidence indicated that the "full value" of the data taken equaled $3.5 million, which is the amount the jury awarded in damages on the conversion claim. Testimony and evidence indicated that the value of Plaintiff's computer files—including development costs for computer programs and other files integral to its business operations—equaled at least four or five times the amount awarded as damages on the conversion claim. (See Doc. No. 242, Tr. 7/30/12, p. 41; see also Doc. No. 242-3, Tr. 8/2/2012, p. 813). Mr. Beck also testified during cross-examination by defense counsel that at the end of 2010, Plaintiff had $43 million in cash assets on hand. (Doc. No. 188, Tr. 7/31/12, p. 270; see also Defendants' Exhibit Number 23). Thus, the jury appears to have reasonably evaluated the

value of the proprietary information taken by Defendants and concluded that the value of that portion that was converted equaled substantially less than the full value of Plaintiff's business and also significantly less than the full cost to develop Plaintiff's source code programs.

This is especially true in light of the possibility that the jury viewed the conversion claim as an alternative claim since it found certain alleged trade secrets did *not* in fact constitute a trade secret. Here, the jury rejected the theory that certain proprietary information constituted a trade secret under North Carolina law. As such, the jury did not find that Defendants misappropriated these trade secrets. Conversion, on the other hand, does not require a finding of a trade secret, and it is reasonable for the jury to have found the evidence that did not rise to the level of misappropriation of a trade secret did in fact establish a claim for conversion. Accordingly, if— as Defendants suggest—the jury relied on evidence as to valuations of propriety (but not trade secret) information in order to arrive at its damages award for conversion, the Court sees no error in such determination.

### 4. Defendants' Claim for Unfair and Deceptive Trade Practices

Defendants asserted counterclaims against Plaintiff Bridgetree and Mr. Beck for unfair and deceptive trade practices. The jury found that while Plaintiff and Mr. Beck engaged in unfair and deceptive conduct, such behavior neither occurred in nor effected commerce, nor did it proximately cause any injury to Defendants. As such, the jury found Plaintiff and Mr. Beck not liable on this claim and never reached the damages issue. Defendants contend the jury's verdict is inconsistent because the evidence showed that Mr. Beck distributed a "Fact Sheet" to business customers and others in the community that falsely accused Defendants of "hacking" into Plaintiff's computer systems. Defendants argue that by disseminating this "Fact Sheet" to companies in the business community, such conduct obviously—contrary to the jury verdict—

occurred "in commerce."  Defendants contend that since the jury found Defendants not liable for computer trespass or violation of the Computer Fraud and Abuse Act, then the statements on the "Fact Sheet" were per se false, thus requiring the jury to find Plaintiff and Mr. Beck liable for unfair and deceptive trade practices.

As an initial matter, Plaintiff and Mr. Beck argue Defendants waived their right to motions under Rule 50 for this counterclaim because Defendants failed to make an appropriate motion as to their counterclaims prior to the time the case was submitted to the jury.  Defendants do not rebut this argument with any authority or discussion.  It is well-settled law that:

> Traditionally [a party] is required to have raised the reason for which it is entitled to judgment as a matter of law in its Rule 50(a) motion before the case is submitted to the jury and reassert that reason in its Rule 50(b) motion after trial if the Rule 50(a) motion proves unsuccessful. See Singer v. Dungan, 45 F.3d 823, 828-29 (4th Cir. 1995). Thus, a Rule 50(a) motion is a prerequisite to a Rule 50(b) motion because the [appellant] must apprise the district court of the alleged insufficiency of Appellees' suit before the case is submitted to the jury. See Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1058 (4th Cir.), cert. denied, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976).

Price v. City of Charlotte, N.C., 93 F.3d 1241, 1248-49 (4th Cir. 1996); see also Exxon Shipping Co. v. Baker, 554 U.S. 471, 486 n. 5 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury.").  In Price, the court determined that counsel's generic Rule 50 motion "on any of the issues brought before the court" sufficiently preserved the issue for post-trial motion purposes. Id.  Here, however, Defendants made no such generic statements, but instead made motions only on Plaintiff's claims, not their counterclaims.  For these reasons, the Court finds Defendants failed to adequately preserve this issue, thereby providing at least one basis to deny Defendants' post-trial motions for judgment as a matter of law on its claim under UDTPA.

As an alternative basis for denying Defendants' motion, the Court has reviewed the evidence, the jury instructions, and the arguments of counsel. The Court cannot say that the jury's verdict finding Defendants not liable under the Computer Fraud and Abuse Act or for computer trespass is inconsistent with the jury's verdict finding Plaintiff and Mr. Beck not liable to Defendants for unfair and deceptive trade practices. Non-liability on computer fraud and trespass claims does not prove *per se* that the use of the word "hack" in the Fact Sheet in reference to Defendants constituted an unfair and deceptive trade practice.

Turning to Defendants' burden of establishing this claim, Defendants failed to present any evidence of actual injury to their trade or business as a consequence of Bridgetree and Mr. Beck's dissemination of the "Fact Sheet." No witness testified that Mr. Beck or Bridgetree sent the Fact Sheet to Red F clients. Moreover, Defendants failed to make a causal connection and did not present *any* witness to corroborate their assertions that certain business leads did not come to fruition after and because of Bridgetree and Mr. Beck's conduct. Therefore, it was reasonable for the jury to find that any unfair and deceptive conduct was not "in or affecting commerce" or that it proximately caused injury to Defendants. Defendants' arguments on this issue are without merit.

### 5. Defendant Teng Li's Defamation Claim

The jury found that Plaintiff and Mr. Beck were liable to Mr. Li for defamation and awarded Mr. Li damages in the amount of $7,500. Defendants contend the amount of damages awarded by the jury was insufficient and unreasonable. After Mr. Li's daughter had been accepted at a private school, Mr. Beck made statements to the school administration concerning Mr. Li. As a result, the school revoked its offer of admission. At trial, Mr. Li testified that Mr. Beck and Bridgetree's defamatory conduct caused Mr. Li great personal and emotional harm,

mostly arising out of the emotional toll the events took on his family and particularly his daughter.[7]  Other evidence, however, indicated that Mr. Li was somewhat removed from the admission process and had not met with school administration.  Testimony showed that the persons to whom the defamatory statements were made did not know Mr. Li.  In closing arguments, defense counsel did not specify an amount of compensatory damages that would be appropriate for Mr. Li and instead intentionally appeared to leave that valuation open to the jury's discretion.  See Doc. No. 243-5, Tr. 8/10/12 at p. 162 ("I'm not going to tell you what to award on presumed damages.  You use your best judgment on that.").  Instead, counsel focused on punitive damages and argued the jury should award Mr. Li $1 million dollars.

The Court finds the jury's verdict on damages to be reasonable, particularly where evidence indicated Mr. Li spent $7,500 on the deposit to the school that later revoked the admissions offer.  Remarkably, the jury did not find punitive damages warranted for Mr. Li's claim, which provides further indicia that the jury specifically considered and rejected a large damage award on this claim.  Defendants' motion on this issue is denied.

### 6. Defendants' Motions for a New Trial

The Court hereby incorporates the preceding discussion and analysis.  Following a thorough review of the transcripts and evidence from this lengthy trial, as well as the applicable law, the Court concludes that Defendants have neither shown that the verdicts are against the clear weight of the evidence nor that the verdicts are based upon false evidence.  This Court has already found that substantial, competent, and credible evidence supports each of the jury's verdicts and the damages awards associated therewith.  Moreover, the Court finds that none of the verdicts will result in the miscarriage of justice.  The Court observed the jurors listening attentively to the presentation of testimony, other evidence, and argument; and the jury's verdicts

---

[7] Mr. Li's daughter was not and has never been a party to this action.

reflect that it paid careful attention to the details and nuances within the evidence presented at trial. The jury made credibility determinations that do not appear inconsistent. Defendants' have failed to satisfy their burden to show a new trial on any issue is warranted, and the Court accordingly denies their request for a new trial.

## C.    Plaintiff's Motion for Attorneys' Fees

Plaintiff requests the Court award attorneys' fees incurred in successfully prosecuting their claims pursuant to the North Carolina Trade Secret Protection Act ("TSPA") and the UDTPA. Plaintiffs calculate their attorneys' fees directly related to their TSPA and UDTPA claims to be a total of 4,033 hours at a total attorney fee expense of $977,115.97. For claims of misappropriation of trade secrets under the TSPA, N.C. Gen. Stat. § 66-154(d) authorizes the award of reasonable attorneys' fees to the prevailing party upon a showing of "willful and malicious misappropriation." Recently, in an order out of the Eastern District of North Carolina, the Honorable James C. Dever, III, summarized North Carolina case law relevant to awarding attorneys' fees under N.C. Gen. Stat. § 66-154(d).

> "Willful means intentionally. Willful is used in contradistinction to accidental or unavoidably." In re Pierce, 163 N.C. 247, 79 S.E. 507, 508 (1913); see Yancey v. Lea, 354 N.C. 48, 52, 550 S.E.2d 155, 157 (2001); Foster v. Hyman, 197 N.C. 189, 148 S.E. 36, 37 (1929); Allstate Ins. Co. v. Lahoud, 167 N.C.App. 205, 208–09, 605 S.E.2d 180, 183 (2004). "Malicious" means an action taken "in a manner which evidences a reckless and wanton disregard of the plaintiff's rights." Moore v. City of Creedmoor, 345 N.C. 356, 371, 481 S.E.2d 14, 24 (1997) (quotations omitted) (collecting cases). Whether to award attorney's fees under section 66–154(d) is committed to this court's sound discretion.

Silicon Knights, Inc. v. Epic Games, Inc., 5:07-CV-275-D, 2012 WL 6809721 *11, __ F.Supp.2d __ (E.D.N.C. Nov. 7, 2012). Similarly, for claims brought under North Carolina's UDTPA, N.C. Gen. Stat. § 75-16.1 authorizes the award of attorneys' fees to the prevailing party upon a showing that "[t]he party charged with the violation has willfully engaged in the act or practice,

*and* there was an unwarranted refusal by such party to fully resolve the matter which constitutes the basis of such suit . . . ."  N.C. Gen. Stat. Ann. § 75-16.1(1) (emphasis added).  It is apparent and the parties do not seem to dispute that Plaintiff is the prevailing party for purposes of the TSPA and UDTPA.

Both the TSPA and UDTPA require Defendants to have engaged in willful conduct in order to award attorneys' fees.  As discussed above, ample evidence supports the jury's verdict that Defendants engaged in misappropriation of trade secrets and unfair and deceptive trade practices.  The jury also awarded Plaintiff punitive damages for Defendants' misappropriation of trade secrets.  As part of the jury instructions on punitive damages for the claim of misappropriation of trade secrets, the Court instructed the jury, "You are to answer this question only if you determine that the misappropriation of a trade secret was *willful and malicious*." (Doc. No. 243-5, Tr. 8/10/12, p. 50) (emphasis added).  No similar instruction was given to the jury on the claim under UDTPA, but the jury could find liability under the UDTPA upon a finding of trade secret misappropriation.  By awarding punitive damages to Plaintiff, the jury found Defendants' conduct of misappropriation of trade secrets to be willful and malicious.  The Court concludes sufficient evidence supports such a conclusion, particularly the remarkable evidence showing four portions of Defendants' source code that contained exact matches to comments, spelling errors and other "anomalies" that "were unquestionably an indication of copying" found in Plaintiff's source code.  (See, generally, testimony of Mr. Robert Young, Doc. No. 242-3, Tr. 8/2/12, pp. 905-908; Doc. No. 201, Tr. Vol. 5, 8/3/12 AM, pp. 918-983). Although Defendants contend they never fully operated a competing product in the marketplace, evidence showed they nevertheless attempted to develop a competing product using trade secrets taken from Plaintiff.  The Court cannot conclude that such obvious instances of copying was

accidental, and the jury apparently agreed. Under N.C. Gen. Stat. § 66-154(d) and the case law explaining this statute, this "willful and malicious" conduct is sufficient to support an award of attorneys' fees under the TSPA and also satisfies the "willfully engaged in the act or practice" requirement under UDTPA.

Under the UDTPA, the analysis of whether to award attorneys' fees does not end with a finding of willfulness. N.C. Gen. Stat. § 75-16.1(1) sets forth the additional requirement of "an unwarranted refusal by such party to fully resolve the matter . . . ." See Llera v. Sec. Credit Sys., Inc., 93 F. Supp. 2d 674, 676 (W.D.N.C. 2000) ("[B]ased on the plain language of the statute, to recover attorney's fees under § 75–16.1, a plaintiff must prove the following: (1) that the plaintiff is a prevailing party; (2) that the defendant willfully engaged in the prohibited act; *and* (3) that the defendant's refusal to fully resolve the matter was unwarranted.") (emphasis added).

Here, in addition to engaging in court-ordered mediation on January 25, 2012, (Doc. No. 126), the parties voluntarily agreed to and participated in a five-hour long judicial settlement conference immediately prior to trial. During the judicial settlement conference, the Court held frank discussions with all the parties and counsel as to the strengths and weaknesses of their respective cases. Both sides engaged in negotiations and appeared to genuinely consider settlement proposals. Based on the Court's communications with and observations of counsel and the parties, the Court cannot conclude that the resulting impasse occurred because of an "unwarranted refusal" by Defendants to "fully resolve the matter." Without satisfying this requirement, attorneys' fees are not available under N.C. Gen. Stat. § 75-16.1.

Under the facts of this case, the Court denies Plaintiff's request for attorneys' fees for its claim under UDTPA but grants the motion for attorneys' fees for Plaintiff's claim under the TSPA. Because Plaintiff's motion and supporting affidavits request attorneys' fees for these

claims combined, the Court instructs Plaintiff to amend its request and supporting affidavits to reflect an amount consistent with this Order. Such revision would include, for example, removal of hours spent on the copying of confidential information avenue of proof for unfair and deceptive trade practices.[8] Such renewed motion is limited to 1,500 words and shall be filed no later than seven (7) calendar days from the date of this Order. Defendants may file a response also limited to 1,500 words no later than seven (7) calendar days after Plaintiff files its renewed motion. If an *in camera* review of billing statements is necessary, the Court will request such materials from Plaintiff's counsel. Following submission of the briefs, the Court will issue an order determining a reasonable amount of attorneys' fees to award Plaintiff.

### D.   Plaintiff's Motion to Amend Judgment

Plaintiff moves this Court to amend the judgment to include prejudgment interest in the amount of $744,634.22, as well as post-judgment interest as allowed by statute from August 13, 2012, until the judgment is satisfied. Under N.C. Gen. Stat. § 24-5(b):

> In an action other than contract, any portion of a money judgment designated by the fact finder as compensatory damages bears interest from the date the action is commenced until the judgment is satisfied. Any other portion of a money judgment in an action other than contract, except the costs, bears interest from the date of entry of judgment under G.S. 1A-1, Rule 58, until the judgment is satisfied. Interest on an award in an action other than contract shall be at the legal rate.

Both North Carolina courts and the Fourth Circuit, in an unpublished opinion, have recognized that an award of prejudgment interest is mandatory. Hamby v. Williams, 676 S.E.2d 478, 481 (N.C. App. 2009) ("We hold this provision [N.C. Gen. Stat. § 24-5(b)] to be mandatory and not discretionary on the part of the trial court, and that the trial court erred in not awarding prejudgment interest to plaintiff."); Castles Auto & Truck Serv., Inc. v. Exxon Corp., 16 F.

---

[8] The Court acknowledges that such ruling might be splitting hairs; however, the Court's role is limited by statute to make an award of attorneys' fees no greater than permitted under the TSPA.

App'x 163, 168 (4th Cir. 2001) (concluding that N.C. Gen. Stat. § 24-5(b) is "unambiguously mandatory") (unpublished).  Accordingly, Plaintiff's motion for prejudgment interest is granted, and Plaintiff shall be awarded prejudgment interest at the statutory rate[9] for all compensatory damages (which includes the $653,292 for trade secret misappropriation; $1.00 for unfair and deceptive trade practices, and $3,500,000 for conversion) from May 18, 2010, until judgment was entered on August 13, 2012.  Such an award equals $744,634.22.  Plaintiff shall also be awarded post-judgment interest on the compensatory damages of $4,153,293.00 at the statutory rate of eight percent (8%) for each day after August 13, 2012, until the judgment is satisfied.[10]

Plaintiff also requests this Court treble the damages award of $653,293.00 for misappropriation of trade secrets.  While it is true that the jury could base its decision finding Defendants liable for unfair and deceptive trade practices based on Defendants' misappropriation of trade secrets, the jury also could have found liability for this claim based on the copying or use of confidential information in an unfair or deceptive manner.  The Court is unconvinced it should incorporate the damages award for misappropriation of trade secrets into the damages award for unfair and deceptive trade practices and treble them, and the Court sees no legal mandate requiring it to do so.  This portion of Plaintiff's motion is denied.

### E.      Plaintiffs' Motion for a Permanent Injunction

The Supreme Court has established a four-factor test that a plaintiff must satisfy before a court may grant permanent injunctive relief. Specifically, a plaintiff must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

---

[9] See N.C. Gen. Stat. § 24-1 (legal rate of interest shall be eight percent).

[10] Even though Defendants did not request it, and in fact argued that such interest is not mandatory, the Court finds the unequivocal directive in N.C. Gen. Stat. § 24-5(b) to also entitle Defendants to an award of prejudgment and post-judgment interest on the compensatory damages award of $7,500.00 at the statutory rate of 8% from the date the defamation counterclaim was filed (July 21, 2010; see Doc. No. 32) until the judgment is satisfied.

remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006). The decision to grant or deny permanent injunctive relief is a matter within the Court's discretion. Id.  North Carolina General Statute § 66–154(a) provides that "actual . . . misappropriation of a trade secret . . . shall be permanently enjoined upon judgment finding misappropriation for the period that the trade secret exists plus an additional period as the court may deem necessary under the circumstances to eliminate any inequitable or unjust advantage arising from the misappropriation."  N.C. Gen. Stat. § 66–154(a).

The Court finds that, under applicable case law, a permanent injunction is appropriate. First, irreparable harm to Plaintiff is presumed because a jury found Defendants to have misappropriated trade secrets. In the context of irreparable injury for a preliminary injunction, the North Carolina Court of Appeals has stated:

> In our belief, misappropriation of a trade secret is an injury of "such continuous and frequent recurrence that no reasonable redress can be had in a court of law." The very nature of a trade secret mandates that misappropriation will have significant and continuous long-term effects. The party wronged may forever lose its competitive business advantage or, at the least, a significant portion of its market share.

Barr-Mullin, Inc. v. Browning, 424 S.E.2d 226, 230 (N.C. App. 1993); see also ABT, Inc. v. Juszczyk, 5:09CV119-RLV, 2010 WL 3156542 *9 (W.D.N.C. Aug. 10, 2010) ("Irreparable harm to ABT is presumed in light of the Court's findings regarding the misappropriation of trade secrets . . . .").  The Court applies this reasoning to Plaintiff's request for a permanent injunction and concludes that the jury's finding of trade secret misappropriation entitles Plaintiff to a presumption of irreparable harm absent issuance of an injunction.  Second, monetary damages or other remedies for the ongoing possession and use of these trade secrets would be inadequate and

could result in an ongoing and possibly never-ending litigation battle. Third, Defendants appear to concede that they would not suffer any hardships because they contend they are not using the trade secrets to compete with Plaintiff. Finally, the public interest would be best served by an injunction prohibiting the use of trade secrets acquired through inappropriate means. Therefore, a permanent injunction is warranted here under the terms below:

IT IS THEREFORE ORDERED that, pursuant to Rule 65 of the Federal Rules of Civil Procedure, a Permanent Injunction shall be immediately entered, as follows:

1.      Defendants and their officers, agents, representatives, employees, members, managers, affiliated entities operating under the direction and control of Defendants (including, but not limited to CustomerStream and Shaanxi Red F Technology Services Company, and also including individuals and entities in China employed, owned or controlled by any of the Defendants) and those persons acting in concert with Defendants (collectively, the "Enjoined Parties"), shall immediately and permanently refrain from (a) any use or disclosure of Bridgetree's compilation of scraper source code, compilation of pre-mover source code, source code compilations, and proprietary data compilations (hereinafter, Bridgetree's "Trade Secrets") or any use or disclosure of source code or data compilations created with, derived from or containing (in whole or in part) Bridgetree's Trade Secrets, and (b) offering for sale or selling of any information or product constituting, containing (in whole or in part), created with, derived from, or otherwise embodying any of Bridgetree's Trade Secrets.

2.      Any individual or entity who in good faith has derived knowledge of any of Bridgetree's Trade Secrets from or through Defendants' misappropriation or by mistake, or any other person subsequently acquiring any of Bridgetree's Trade Secrets therefrom or thereby, is

immediately and permanently enjoined from disclosing such trade secret(s), in accordance with the provisions of N.C. Gen. Stat. § 66-154(a)(2).

3.      Within fourteen (14) days of the entry of this Permanent Injunction, the Enjoined Parties shall return to Bridgetree any documents or files (whether in hard copy or electronic form) constituting, containing (in whole or in part), created with, derived from, or otherwise embodying any portion of Bridgetree's Trade Secrets, provided that counsel for Defendants may retain one copy of such documents or files, to be maintained on an Attorneys' Eyes Only basis (under the terms of the Stipulated Protective Order entered by this Court on April 26, 2011), and solely for the purpose of any post-trial or appeal proceedings.

4.      Within fourteen (14) days of the entry of this Permanent Injunction, the Enjoined Parties shall destroy all documents, software, source code, or other information or product created by the Enjoined Parties from (or with reliance on) any of Bridgetree's Trade Secrets, and provide to the Court a certification of the same.

5.      For the purpose of ensuring compliance with Paragraphs 3 and 4, above, each Defendant shall, within twenty-one (21) days of the entry of this Permanent Injunction, provide to the Court a signed declaration or affidavit certifying compliance with Paragraphs 3 and 4.

6.      For a period of ninety (90) days following the entry of this Permanent Injunction, the Enjoined Parties may not offer or sell any pre-mover product or service created by any of the Enjoined Parties.  After the expiration of the ninety (90) day period, if any of the Enjoined Parties wish to offer or sell any pre-mover product or service created by any of the Enjoined Parties, such product or service must be created using a clean room process which does not permit access to Bridgetree's Trade Secrets.  The procedure for such clean room process shall be as follows:

a.     The physical location of the clean room shall be in or around Charlotte, North Carolina, at a location to be disclosed to counsel for Bridgetree upon its selection.

b.     The only employees or agents of the Enjoined Parties permitted to be present in the clean room are those that (i) have no prior exposure to Bridgetree's Trade Secrets, (ii) have read the provisions of this Order, and (iii) have signed an affidavit that they will comply with the terms of this Order.

c.     A third party "gatekeeper," who is an independent, third party forensic examiner with expertise in source code development and analysis, to be mutually selected by the parties (or, in the absence of agreement by the parties, selected by the Court considering suggestions of the parties) (hereinafter, the "Gatekeeper") will vet all materials going into the clean room to ensure they are devoid of Bridgetree's Trade Secrets.

d.     The Gatekeeper shall also vet all work product emanating from the clean room to ensure that it does not contain any of Bridgetree's Trade Secrets.  Should the Gatekeeper, in his or her sole discretion, conclude that any work product emanating from the clean room contains any of Bridgetree's Trade Secrets, he or she shall request that the developers in the clean room recreate the source code at issue.  Any disputes arising from such requests or any developer's refusal to comply shall be brought to the attention of the Court.

e.     The cost of this clean room process, including all fees and expenses charged by the Gatekeeper, shall be borne by the Enjoined Party or Parties seeking to create the new pre-mover product or service.

7.     In order to monitor compliance with this Order, Defendants shall, for a period of two (2) years commencing at the expiration of the fourteen (14) day period set forth in Paragraph

4, make available for inspection all computers used by the Enjoined Parties, at any time since January 6, 2010. Such inspection shall be performed by an independent, third party forensic examiner with expertise in source code development and analysis, to be mutually selected by the parties (or, in the absence of agreement by the parties, selected by the Court considering suggestions of the parties)[11], who shall be assisted by Bridgetree technical representatives Chris Harris and Robin Snyder.[12] Inspections may be conducted only after Plaintiff moves the Court for permission to conduct such inspection, which the Court will grant only upon a showing of probable cause by sworn affidavit. The inspection shall be conducted and documented in any manner deemed fit by the examiner, with due consideration given to the goal of obtaining accurate information while at the same time not causing undue disruption to Defendants' operations or incurring unnecessary costs. Within sixty (60) days after such inspection, the examiner shall submit a written report to the Court, with copies to be supplied to counsel for the parties on an Attorneys' Eyes Only basis. The cost of this inspection shall be borne equally by Bridgetree (50%) and Defendants (collectively, 50%); however, in the event an inspection shows a violation of this Order, the cost of the inspection shall be borne by Defendants.

8.      The Court retains jurisdiction over the Defendants and this action for the purpose of enforcing the permanent injunction hereby entered.

### III.    CONCLUSION

IT IS THEREFORE ORDERED that for the reasons explained above:

1.              Defendants' Motion to Stay Execution of the Clerk's Judgment (Doc. No. 215) is DENIED AS MOOT;

---

[11] This third party examiner may be the Gatekeeper selected for the clean room process pursuant to Paragraph 6.

[12] Prior to participating in any inspection described in Paragraph 7, Messrs. Harris and Snyder shall sign Exhibit A to the Stipulated Protective Order entered in this case (Doc. No. 81), and shall treat all materials reviewed in connection with such inspection as Attorneys' Eyes Only.

2.　　　　Defendants' Motion for Judgment as a Matter of Law and, in the alternative, to Alter the Judgment or for a New Trial (Doc. No. 217) is DENIED;

3.　　　　Plaintiff's Motion for Attorneys' Fees (Doc. No. 209) is GRANTED IN PART and DENIED IN PART with a supplemental order to issue following briefing as to a reasonable amount;

4.　　　　Plaintiff's Motion to Alter the Judgment (Doc. No. 218) is GRANTED IN PART and DENIED IN PART; and

5.　　　　Plaintiff's Motion for a Permanent Injunction (Doc. No. 223) is GRANTED as set forth above.

IT IS SO ORDERED.

Signed: February 5, 2013

Frank D. Whitney
United States District Judge